LEWIS WILLIAMS V. THE STATE.

No. 1602.    Decided June 24, 1897.

**1. Evidence—Contemporaneous Crimes—Rules as to Admissibility of.**

To render evidence of contemporaneous crimes, to show intent or identity, admissible, the following conditions must exist: *a.* Ground must first be laid implicating the defendant in the case under trial; and unless sufficient evidence of this has, in the opinion of the judge, been received, all evidence of other offenses, to prove intent, must be excluded. *b.* The extraneous crime can not be put in evidence without proof that defendant was concerned in its commission. *c.* There must be system established between the offense on trial and that introduced to connect it with the defendant. *d.* Where system has been established, the testimony of other offenses is not excluded by the fact that the defendant had been indicted for their commission.

**2. Same—Intent—Identity.**

To be admissible such evidence must first show defendant's guilty connection with the prior offense before it can be used as a factor in establishing his guilt as to the offense for which he is on trial; and then it may be used as a circumstance tending to identify him with the subsequent offense.

**3. Same—Murder in the Perpetration of Burglary.**

On a trial for murder, where it appeared that it was committed in the perpetration of burglary, evidence that the burglary was committed in a certain way, and that defendant was identified with its commission, is not of itself sufficient to authorize proof of another previous burglary committed much in the same way, where it does not appear that any witness at the time saw defendant, and where it is not even suggested that he was suspected of this prior burglary previous to the homicide; and it is prejudicial error to admit such testimony.

**4. Murder—Lost Confession in Writing—Secondary Evidence.**

On a trial for murder, where it appeared that defendant made a voluntary confession before a justice of the peace, which was reduced to writing and signed by defendant; and it was shown that the same was thereafter given by the justice to a member of the grand jury, Held that before a copy of said confession could be resorted to, as secondary evidence of its contents, it was incumbent upon the State to show that the original was lost, and that all reasonable means had been used and exhausted to produce it. And, under the circumstances stated, Held further, that the

evidence of the loss was not sufficient, which shows that the last custodian of the paper (the grand juryman) was not produced or attempted to be produced, and that none of the grand jury were called in reference to it.

**5. Murder in the Perpetration of Burglary—Charge.**

On a trial for murder, where the evidence of malice aforethought is based on the idea that the homicide was committed in the perpetration of burglary, the charge should submit the issue of malice aforethought as evidenced by a murder so perpetrated.

APPEAL from the Criminal District Court of Harris. Tried below before Hon. E. D. CAVIN.

Appeal from a conviction for murder in the first degree; penalty, death.

The opinion contains a concise but very clear statement of all the material facts in the case, and no additional statement is required as to any of the questions discussed.

*J. M. Gibson,* for appellant.—Even if it be true that the testimony of Miss May White and Simmons was admissible so far as to show circumstantially defendant knew money was kept in the house, yet only that fact was admissible; the evidence of the poisoning of the dog, the taking of the pants of Simmons to the stairway, and the purloining of the money was clearly erroneous and incompetent until defendant had been connected therewith. Galbraith v. State, 41 Texas, 567; Gentry v. State, 25 Texas Crim. App., 614; Barton v. State, 28 Texas Crim. App., 483; Wheeler v. State, 23 Texas Crim. App., 598; Mayfield v. State, 23 Texas Crim. App., 645; Reno v. State, 25 Texas Crim. App., 102; Drake v. State, 25 Texas Crim. App., 293; Rogers v. State, 26 Texas Crim. App, 404.

It was the duty of the court to find first that defendant had committed or was connected with the other crime, that of the 31st of March, before permitting evidence of it to be used on trial of a similar offense; and the court having permitted evidence of the burglary of the 31st of March, and not by instructions eliminating it altogether from the consideration of the jury, or limiting the consideration of it to statements only relating to same which showed defendant's knowledge of the house and the presence of money in Baker's pocket or the dresser, was as good as the court telling the jury in explicit words and to the effect that the defendant committed the burglary of 31st of March, and that said burglary was connected with the killing of May 27th. It was a finding of a predicate by the court unsupported by the evidence. Barton v. State, 28 Texas Crim. App., 483.

It was error for the court to permit the State to read in evidence the purported copy of a confession made by defendant to Mahoney, a justice of the peace. If the State could have used the confession at all, it could only have used the original, which had been signed and sworn to by defendant. Code Crim. Proc., art. 790.

38 Texas Crim. App.—9

To authorize secondary proof of the contents of the original, the State was required, first, to show that the said original was lost through no fraud on the part of the State, and that due diligence had been exerted to find and obtain it. All that the testimony shows as to diligence is, that on the trial of the case Mahoney testified that some months before, at another term of court, he delivered it in a sealed envelope to a member of the grand jury; that the district attorney, who should receive the papers from the grand jury, had no recollection of ever seeing it, and that he had made search in his office among the papers where grand jury documents were kept, but could not find it; that the district clerk and his deputy, neither of whom had ever seen it, had searched in the clerk's office and the district attorney's office, and could not find it. We submit this was not diligence. No member of the grand jury had been summoned and asked what had become of the documents. Any member of said grand jury could have carried it home in his pocket, or could have delivered it to outside prosecuting counsel for the State, or could have delivered it to the sheriff, or other officer about the courthouse. This inquiry should have been set on foot, before the trial of the case, and it does not follow that because the grand juror may not have given it to the proper officer, that he was culpable or a criminal. The defendant was entitled to have the original paper presented, if it was in existence and could have been found. His signature identified it. To permit a witness to tell what the contents of a sworn paper was, without every effort being made to produce the original, is to open the door to fraud and perjury, dangerous to human life and liberty.

*Hutcheson, Campbell & Myer, Frank Andrews,* and *Mann Trice,* Assistant Attorney-General, for the State.—The evidence of Miss May White and H. J. Simmons to the circumstances tending to connect defendant with a previous burglary of the house, and showing the similarity of conduct to the party who committed the first as well as the second burglary and murder, was admissible as a circumstance of identity. Galbraith v. State, 41 Texas, 567; Davison v. State, 12 Texas Crim. App., 215; Whart. Crim. Ev., secs. 31-38, 46-48.

Secondary evidence is admissible to prove contents of lost instrument. Mahoney having prepared himself the written memoranda handed him, could use it to refresh his memory, and it was not incumbent on anybody to offer the memoranda in evidence; besides, defendant did not ask that the memoranda be offered in its entirety, or in any other manner, in evidence. Hamilton v. Rice, 15 Texas, 386; Cheatham v. Riddle, 8 Texas, 162.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree and his punishment assessed at death; hence this appeal.

In order to properly consider appellant's bills of exception, we will summarize the evidence in the case. The State offered testimony of a circumstantial character tending to show that appellant was the guilty

party, and also offered in evidence the confessions of appellant, made to three different witnesses, to the same effect. Appellant introduced proof of an alibi, and also denied making the confessions. The evidence on the part of the State showed that the murder was committed in the city of Houston on the night of the 27th day of May, 1896. The deceased, I. B. Baker, was living in a two-story house at the corner of McKinney and La Branch Streets. At the time, his family was absent on a visit to Navasota, and the only inmates of the house were deceased, Frank Andrews, and H. J. Simmons, all of whom occupied separate sleeping rooms in the second story—the last two named being boarders. On the night in question, Andrews came in, went upstairs, and retired to his room about 11 o'clock; locking the door and going to bed. He left the night lamp, which was lighted, on the stair steps. At about 12 o'clock H. J. Simmons came in. He also went upstairs to his room, and as he went he took the lamp with him, and set it on a table in the hall and blew it out, and went to his room and went to bed. These witnesses did not know whether the deceased, Baker, had gone to bed when they arrived. Simmons states that he noticed that the door of his room was closed, and that there was no light in the room. Both testify that there was no chair or obstruction on the front stairway when they came up. Neither of said witnesses heard any disturbance in the house during the night, and both were unaware that a murder had been committed in said house until they were aroused by others early the next morning. About 6 o'clock the next morning the cook, Amelia Pearson, who slept some two blocks distant from the house, came to prepare breakfast, and came into the main house through the kitchen, and there discovered the deceased lying at the back stairway. She immediately gave the alarm, and it was discovered that I. B. Baker had been murdered. It was discovered that the house had been burglarized; some person having entered the kitchen through a small window, and then gone into the main house. As evidence that the person entering the house had done so for the purpose of burglary, a quantity of silverware was found in some bags on the table in the kitchen, evidently arranged for the purpose of being carried away, and also the pants of deceased were found in the hallway near the main or front stairs. The front stairway was found to be barricaded or obstructed by a chair which extended clear across the stairway, and the rear stairway was also obstructed by a chair. Evidently the deceased lost his life on the back stairway, near the obstruction, which was close to the landing or little platform where the stair turns, as the blood was found along said stairway from that point to the lower floor where the deceased was lying. He was found to be shot in the eye, the bullet going through his mouth and through his jaw; the same bullet evidently penetrating the wall of the little stairway where the struggle began. Marks of violence were also discovered on the face and across the mouth of the deceased. A six-shooter, with one barrel freshly discharged, was found near where deceased was lying.

The theory of the State was: That the person perpetrating the homicide was familiar with the place. He knew the situation of all the rooms and the approaches thereto, and the situation of the stairways—both back and front. That, after having procured the silver and bundled it up, he then went upstairs into the room of deceased. About the time he got the deceased's pants and started out of the room, the deceased discovered him and made pursuit, armed with a large pistol—the one found lying near where he fell at the base of the stairs. That the party, on being discovered, ran out of the room with the pants of the deceased. The deceased, in his pursuit, in the darkness, passed the person, and ran down the front stairway, and then proceeded to the back stairway, and was going up that, when he met his slayer about midway of the stairs, and the conflict ensued in which deceased was killed. As circumstances tending to show that appellant was the perpetrator of the homicide, the State introduced proof showing that appellant had previously, for two or three years, been employed about the house of the deceased, that some three or four months previous he had voluntarily quit said employment, and that he was perfectly familiar with all the conditions and surroundings of said premises. It was shown that about a month previous he had applied to Mrs. Baker to borrow a dollar, and she, not having the change, applied to her sister, Miss May White, an intimate of the house, to loan her that amount. Appellant accompanied Mrs. Baker to the door of the room, and saw her take from the drawer about $100 in bills, and so he became aware of where the money of Miss White was kept. It was also shown that, a few days before the homicide, appellant (who was in the habit of visiting the place) came to the house and interviewed the colored boy, by the name of William Boulding, as to where the family was, and how long they would be absent. H. C. Burtis testified that after he parted with Mr. Simmons, in front of the house of the deceased, as he went around the corner on La Branch Street on the night of the homicide he saw a person in the rear of the premises, on the sidewalk, and on account of his suspicious appearance he watched him closely; that he had never seen the appellant before, but on subsequently seeing him, after his arrest, he took the defendant and the person he saw to be one and the same person. This was a little after 12 o'clock on the night of the murder. A negro (Jack Mitchell), who knew the defendant well, testified that he was at a point on Lamar Street about half past 1 o'clock on the night of the homicide, and he saw a man going down on the opposite side of Lamar Street, towards Main Street, in a fast walk, with his hat pulled down over his face; that when the party got opposite to him under the electric light, he recognized that it was the defendant, and hailed him, and said: "Hello, Mr. Williams! Is that you?" Defendant waived his hand and said: "Don't you speak to me. I am in trouble. If you say anything to me you may get in trouble too." Defendant was going in a fast walk, and soon distanced witness. It was also shown that appellant, though he appeared to have quite a friendship for the de-

ceased, acted somewhat peculiarly on the day of the homicide; and, although the homicide was a sensation in the city of Houston on the next day, he does not appear to have known of it until about 11 o'clock, and he did not go to the residence of the deceased until about 4 o'clock that evening. These are substantially the salient features of the circumstantial evidence offered by the State. In addition, the State offered, through a negro detective, Bass Reeves, the confessions of the defendant made to him at Marshall. This party seems to have been employed for the purpose of hunting down the guilty person, and to have been with the defendant and shadowed him for some months. He went with him to various points; to Marshall, Shreveport, Indian Territory, and back again to Houston. He states that: "At Marshall he asked the defendant what he had killed Mr. Baker for, and he stated he killed Mr. Baker, but he didn't go there to do it; that Little Bit needed some money, and he went there to get it; that he knew Mr. Baker always carried money in his pockets, and that when he went into the house, and just as he had gotten Mr. Baker's clothes out of his room, Mr. Baker woke up and got after him, and that he darted into the hall in the dark. Mr. Baker passed him and ran on down stairs, and when he [Baker] came up the stairs he [Lewis] met him [Baker] and he [Lewis] cut at him [Baker]. Mr. Baker snapped his pistol at him, and he wrenched it out of his hands, shot him with it, and killed him. He said that he didn't go there to kill Mr. Baker, but that he done it from fear; he had to do it."

The State also proved by a negro woman, Jennie Goodby, that she overheard defendant make the same statement; that she was listening at the door on one occasion, and heard him tell the witness Bass Reeves what has already been stated. It was also shown by one John Selsar that the detective, Reeves, brought defendant to his ranch in the Indian Territory, and the defendant there made the following confession to him: That on one occasion he went to where Reeves and defendant were, having previously had an understanding with Reeves, and stated to them both: "You boys say you are just from Houston, and you were both in jail about that Baker murder down there. Now, tell me which one of you it was that killed Baker." Defendant remarked that Reeves had nothing to do with it, that "I [defendant] and others done it." That he then asked him why he did it, and he said he did it from fear, but that he did not like to talk about it. Appellant showed by his witnesses an alibi; that is, that from 12 o'clock until the next morning he was at another and different place; that is, that he went from a certain dance hall in the city of Houston at about 12 o'clock, that he went with Mary Harris to her home, and he left her about 1 o'clock. Henrietta Mitchell, the paramour of appellant, testified that appellant came to her house, and a short time after that she heard the clock strike 12, and that he remained there all night. Appellant also took the stand in his own behalf, and denied making the confessions attributed to him, and his witnesses explained some of the inculpatory circumstances against him.

This was substantially all the testimony adduced by both parties. The theory on the part of the State was that the homicide was committed in the perpetration of burglary, and the only real question in the case was as to the identity of the defendant as the person who killed the deceased.

1. On the trial the State was permitted to introduce the details of a burglary of the house of the deceased committed on the night of the 31st of March, 1896, about one month prior to the homicide, and defendant reserved thereto the following bills of exception, to wit: "Be it remembered, that upon the trial of the above-entitled cause the following proceedings were had and exceptions taken: One Miss May White, being called for the State as a witness, being sworn, was permitted to testify as follows: That on the 31st day of March, 1896, she was living at the house where I. B. Baker was killed on the 27th day of May, 1896; that on said 31st day of March, in the nighttime, said residence or house occupied by said I. B. Baker was entered at night by some burglar or thief, who ransacked the house and took various articles, jewelry, and money therefrom, and that Lewis Williams had been there at the house on the day previous to said 31st day of March, the time of said burglary; that on the day previous to the burglary the defendant came to the house of I. B. Baker, and asked Mrs. Baker to loan him $1; that Mrs. Baker did not have the money, and asked the witness if she had $1; she told her that she had, and it was in her pocketbook, in her bureau drawer; that Mrs. Baker went to her drawer, in the presence of the defendant, and took out a roll of bills containing $100, and $1 from under the bills, and gave it to this defendant; that in the night she remembered the occurrence of a dog being poisoned the evening previous, and, being suspicious, she got up and took her pocketbook out of the bureau drawer, and placed it under the dresser; that in the night she was awakened, and heard a burglar come into the room, but her back was towards him, and she was afraid to turn over and look at him, and did not know whether he was white or black; that he went to the bureau drawer and found nothing, and left the room; she then raised the alarm, and the burglar fled. Witness did not say the burglar ransacked the house, but was in Mr. Simmons' room, took out his clothing, and left them on the table in the dining room; took a box out of the room in which Mr. and Mrs. Baker were sleeping, in which change was usually kept, and sometimes jewelry. She heard him open her door, come in her room, tip by her bed, and go to the bureau from which Mrs. Baker had taken the purse and money that day, and pull out a drawer of said bureau, which he left open, and which was the same one from which Mrs. Baker took the purse and money the day before; and the witness otherwise testified to the circumstances of the first burglary as shown in the statement of facts, which is here referred to. To all of which evidence the defendant objected on the ground that the same was irrelevant and incompetent, and was calculated to prejudice the minds of the jury against this defendant on the trial of this cause, which objection being overruled, defendant then and there excepted," etc. Bill of exceptions number 4 is as follows: "Be it remem-

bered, that upon the trial of the above entitled and numbered cause the following proceedings were had and exceptions taken; the State having called one H. J. Simmons, and who, being sworn, testified as follows: That on the night of the 31st day of March a dog appeared to have been poisoned, and died; that on that night the house was burglarized, and that his pants were taken out in the hall, and that some $14 or $16 in money taken out of his pants; that he knew nothing of the burglary until the morning after, when he discovered that his pants had been removed, and the money taken. To all of which testimony the defendant then and there objected on the ground that same was irrelevant to any issue in the case, and was calculated to prejudice the jury; that it was incompetent to show the commission of a previous offense by some one unknown to prove motive or criminating facts against the defendant in this case. Which objection being overruled, defendant then and there excepted, and tenders this his bill of exceptions," etc. We presume the object of this testimony was to show that the person committing said previous burglary committed the last burglary, in which the homicide was committed. The State contends that, although it was a separate and distinct transaction, yet it was admissible as evidence to show identity (that is, to amplify); that the person who committed the first burglary showed a knowledge of the premises and of the environments, and that, defendant being shown to have such knowledge, he likely committed said burglary; and, as the subsequent burglary was committed much in the same way as the first, that appellant was probably guilty of the second burglarious entry. We are referred by counsel for the State to the following authorities on the subject: Gilbraith v. State, 41 Texas, 567; Davison v. State, 12 Texas Crim. App., 215; and Whart. Crim. Ev., secs. 31, 32, 46. Gilbraith's Case enunciates the principle which is found in all the authorities: "That evidence of distinct crimes is admissible to show identity, in developing the res gestæ, or in making out the guilt of the defendant by a chain of circumstances connected with the crime for which he is on trial, and also when the intent with which the particular act is done may be the gist of the offense." Davison's Case was a case of swindling. The party obtained money under certain false pretenses; the false pretenses being that he was authorized to solicit subscriptions to a certain magazine. He obtained the money for the purpose of sending for said magazine. The party did not receive the magazine ordered, and the defendant claimed that he had forwarded the money with the order. To rebut this claim of defense, the State was permitted to prove other like offenses committed by the appellant about the same time. Mr. Wharton enunciates the same general rule as above; that is, "When an extraneous crime forms a part of the res gestæ, evidence of it is not excluded by the fact that it is extraneous." See Whart. Crim. Ev., sec. 31, and authorities there cited. He also states that: "Such evidence of other crimes is admissible for the purpose of showing a system." Id., sec. 32. "Such evidence is permissible to show scienter, as in forgery. Other forgeries than the one charged may be shown." Id., sec. 34. "So evidence of

other crimes is admitted to rebut a defense of accident, as where a party is charged with firing his house in order to defraud the insurers, and he pleads accident. To meet this it is permissible to prove that on prior occasions houses occupied by the defendant had been burned, and that he obtained payment for the same from separate insurance companies. And for the same object evidence of an attempt three days before the firing by the defendant of the same property may be received." Id., sec. 36. "When poisoning is also set up by the prosecution, it is admissible, in order to rebut accident, to prove other attempts by the same defendant to poison other persons, when such attempts are part of a system with that under trial. When the object is to show system, subsequent as well as prior offenses, when tending to establish identity or intent, can be put in evidence." Id., secs. 37, 38. Mr. Wharton, in summing up, deduces the following rules: "To sustain the exceptions heretofore enumerated, however, and to make evidence of independent crimes admissible, the following conditions must exist: (a) Ground must first be laid implicating the defendant in the case under trial, and unless sufficient evidence of this has, in the opinion of the judge, been received, all evidence of other offenses to prove intent must be excluded. For it is a violation of the fundamental sanctions of our law to admit evidence that the defendant committed one offense, in order to prove he committed another. (b) The extraneous crime can not be put in evidence without proof that the defendant was concerned in its commission. (c) There must be system established between the offense on trial and that introduced to connect it with the defendant. (d) When system has been established, the testimony of other offenses is not excluded by the fact that the defendant had been indicted for their commission." Id., sec. 48. Now, applying the above rules to the case before us, can it be said that the appellant in this case is identified as the perpetrator of the burglary on the 31st of March? It does not appear that any witness saw him, nor is it even suggested that he was suspected of the prior burglary previous to the homicide. The circumstances narrated might create some suspicion that he might have committed the first burglary, but certainly it can not be contended, upon the testimony in that connection, that he could be convicted for said offense. We would not be understood as holding that proof must be made of a positive character connecting defendant with the first burglary; but, being circumstantial, it must be such under the rules of evidence as applied to that character of testimony, as would strongly tend to connect appellant with the first offense. We are not permitted to find him guilty of the last offense, and, because he is guilty of the last, authorize the admission of the first; but having adduced evidence implicating him in the charge for which he is being tried, then it would be permissible, after showing that he was guilty of some extraneous crime, to introduce evidence in regard to the same which might tend to identify appellant as the perpetrator of the offense for which he is being tried. In this case, however, as previously stated, there is no proof pertinently connecting defendant with the commission

of the burglary on the 31st of March. In this regard it would seem that, before evidence of an extraneous crime can be offered, some cogent evidence should be adduced of appellant's connection therewith; otherwise, the conclusion reached would rise higher than the premise on which it is based. See Burrill Circ. Ev., p. 136. And, if there is not such proof, evidence of extraneous crimes should not be admitted, because, if such evidence is not relevant, in its very nature it is calculated to prove hurtful to the party on trial. To illustrate: If evidence of such extraneous crimes can only be admitted when the defendant is shown to be connected therewith, its admission is a suggestion to the jury that the appellant is guilty of such other offense, and being guilty of such other offense, that he is likely guilty of the offense for which he is being tried. See Smith v. State, 21 Texas Crim. App., 96; Reg. v. Harris, 4 Fost. & F., 342; Com. v. Edgerly, 10 Allen, 184; People v. Thomas, 3 Parker Crim. R., 256; Reg. v. Dossett, 2 Car. & K., 306. It will not do to say that the evidence shows that the last burglary—the one in which the homicide was committed—was done in a certain way, and that the defendant was identified with this last burglary, and that, therefore, the previous burglary, done in much the same way, points to the defendant as the perpetrator of the previous burglary, identifies him therewith, and so the previous burglary is made to furnish evidence of appellant's identity with the subsequent burglary. This would be arguing in a circle; not only so, but would be starting at the wrong end and arguing backwards instead of forwards. We are not permitted to go backwards; that is, to find defendant guilty of the last offense, and then take that as a factor to establish his guilt in the first. The evidence must first show his guilty connection with the prior offense, before it can be used as a factor in establishing his guilt as to the offense for which he is on trial, and then it may be used as a circumstance tending to identify him with the subsequent offense. It may be urged that in this case we have very strong circumstances pointing to the defendant as the perpetrator of the last burglary and homicide, and in addition we have his confessions in evidence. It seems, however, that the prosecution was not content to rest the case upon that evidence, but persisted, over objections of the appellant, in showing the circumstances of the previous burglary against him. We can not say that this evidence was not prejudicial to the appellant, especially in view of the fact that he introduced evidence denying the confessions attributed to him, and also traversing, by his alibi, and other circumstances, the circumstantial case proved against him on the part of the State.

2. Appellant complains that a certain copy of a voluntary statement alleged to have been made by him was introduced in evidence, through the State's witness Mahoney, over his objection. The objection urged by him was that a sufficient predicate was not laid, showing the loss of the original voluntary statement. The bill shows that the paper in question (that is, the voluntary statement) was in the possession of Mahoney, and that he handed it to a member of the grand jury (the name of said

grand juror is not disclosed), and that he had not seen it since. It was shown by Gillespie that he was the custodian of all papers used by the grand jury, and that the papers of the grand jury for the June term of the Criminal District Court of Harris County, 1896, which was the term at which the indictment was found, were all delivered to him, and by him left in his office as usual, but all papers for that term had disappeared, and the most diligent search had failed to discover them; that he also had the grand jury room searched, and the clerk's office, but was unable to find the paper anywhere. In addition, George Ellis, the district clerk, and A. L. Conway, his deputy, were put on the stand; and they testified that they had made diligent search all through the office of said clerk, and had failed to find said paper, or any of the papers of said grand jury for the June term, 1896; and said Conway further testified that he had personally searched among all the papers in the office of the district attorney, and had likewise failed to find said paper, or any of the grand jury papers for the June term, 1896. The bill of exceptions calls the paper a copy of a voluntary statement made by the accused before J. T. Mahoney, justice of the peace of Harris County, after being duly warned by said justice that same might be used against him as evidence in court, and that it could not be used for him. And Mahoney testified, "that the copy was an exact copy of the original statement made by defendant before him, which he took down at the time in his own handwriting, and that the copy was likewise in his own handwriting, being made by him for the use and at the request of Mr. Ben Campbell, one of the prosecuting attorneys in this case; that the original of this paper he had folded up with three other papers in the case of State v. Lewis Williams, pending in his court, placed them in an envelope, and sealed them, and wrote the words 'Grand Jury' across the face of it, and delivered it to the grand jury of Harris county, in session in June, 1896, but he did not recollect to which member of the grand jury he had delivered it; that the original statement had not been seen by him since; that the original statement was made by defendant while in jail, under the following circumstances: Witness was sent for to come to the jail, as defendant wished to make a voluntary statement. When witness arrived, defendant was brought out and taken upstairs, and thereupon witness warned the defendant that, if he made any statement, the same might be used against him in any case against him in any court, and that it could not be used for him, and that he could not be compelled to or required to make any statement at all; but defendant said he wanted to make a statement, and thereupon defendant commenced to make a statement, and witness to write it down," etc. Now, it is contended that this paper was not taken in an examining trial, and was not a judicial confession, or a voluntary statement made in the court on an examining trial. It is also contended that it is not shown that said paper was signed, and we are asked to treat it as a memorandum statement made by the justice of the peace. There are some expressions in the bill of exceptions which indicate that said statement was a voluntary confession of the defendant,

taken before a magistrate. It seems that the magistrate went to the jail and had the defendant brought out, went upstairs, and took his voluntary confession. Whether or not he held court upstairs over the jail, is not stated. The statement shows that this paper, with three other papers in the case of the State against Lewis Williams, pending in said Justice Court, were placed by him in an envelope, and sealed, and addressed and delivered to the grand jury. This is exactly what is required as to examining trial evidence. The bill does not show that said statement was signed by the defendant, nor does it show the contrary. In such case, if we look to the statement of facts, the witness states that he reduced the statement to writing, and the defendant signed and swore to it, and that he put it, with the other papers in the case, in an envelope, and sealed it, and indorsed and addressed the same to the grand jury, and turned the same over to them in person; that he did not know to what member of the grand jury he handed it, but to one of them; that he made a copy of that statement a day or two after it was made, at the request of Mr. Ben Campbell; that the copy he prepared from the original statement, and it is an exact copy of the original statement. Now, if we treat this paper as a voluntary statement before the committing magistrate, taken in the case then pending against appellant, unquestionably the original paper should be produced, or its loss accounted for, before secondary evidence should be admitted of its contents. If we treat it as an extrajudicial confession, but a written confession, signed and sworn to by appellant, it contains the original confession made by him; and parol evidence of its contents, in our opinion, would not be admissible, unless the loss of such original was first shown. If parol evidence would not be admissible, a copy of said original written statement would not be admissible, unless the original was shown to have been lost, and diligent search made therefor. In Guy v. State, 9 Texas Crim. App., 161, it appears that the paper there offered in evidence was taken during an examining trial, but no certificate was shown. The original was introduced in evidence, and parol evidence of the contents of said original. The court say one or the other was certainly admissible, and, they being similar, that no injury resulted to the defendant. In Krebs v. State, 8 Texas Crim. App., 1, the dying declaration of Mrs. England was offered. It was objected that said declarations had been reduced to writing, and the written statement was the best and only legitimate testimony. The court say that: "The record did not affirmatively show that the declarations had in fact been reduced to writing and signed by the declarant. If it had so shown, parol evidence would have been inadmissible, unless the prosecution had shown that it was not in the power of the State to produce the writing." The opinion cites Whart. Hom., sec. 766, and Greenl. Ev., sec. 161. In the shape in which the record is presented to us, we hold that, whether this confession was made in the course of a preliminary examination or not, it was undoubtedly reduced to writing, and not only signed, but sworn to, by appellant, and that this constituted his original confession, and, before secondary evidence could be resorted to, it was incumbent on

the State to show that said paper was lost, that reasonable search had been made therefor, and that the same could not be found. See Haun v. State, 13 Texas Crim. App., 383. What purported to be a copy of said voluntary statement of defendant, made by Mahoney, the justice of the peace, on the above predicate, was introduced in evidence. The question presented for our consideration is, was the showing made, sufficient for the introduction of secondary testimony? It will be noted that the name of the grand juror to whom said paper was delivered is not disclosed by Mahoney in his evidence, nor is it shown that said paper was ever before the grand jury, or ever used in said grand jury room. For aught we know, said paper was never before the grand jury at all, but still remains in the hands of the grand juror to whom Mahoney delivered it. It was certainly practicable, if Mahoney did not remember the name of this grand juror, to have had all the grand jury for the term summoned, and ascertained to whom he delivered said paper, and have ascertained whether or not said paper was used in the grand jury room, and what became of it thereafter; the rule in this regard being that all reasonable means should be used to produce the alleged lost paper, before secondary evidence can be resorted to. In this case the last custodian of the paper was not produced, or attempted to be produced, and none of the grand jury were called. This should have been done, and this line of inquiry exhausted, before secondary evidence should have been admitted. This copy was used to contradict appellant, he testifying in the case. In that respect it was material, and the introduction of said paper, under the predicate laid, was improper.

No question is made as to the charge of the court, but, in view of another trial of the case, we would observe that the evidence of malice aforethought, as furnished by the record, is based on the idea that the homicide was committed in the perpetration of burglary. The court only gave the ordinary charge on express and implied malice. In this connection we refer to Washington v. State, 25 Texas Crim. App., 387, and Sharpe v. State, 17 Texas Crim. App., 486. It is not necessary to discuss matters contained in the motion for a new trial based upon newly-discovered evidence, as it is not likely the questions involved in said newly-discovered evidence will arise on another trial of this case; but for the errors discussed the judgment of the lower court is reversed and the cause remanded.

*Reversed and remanded.*

[NOTE.—The State's motion and amended motion for rehearing were overrruled without a written opinion.—Reporter.]